In re **CIRCUIT ALLIANCE, INC.,** Debtor.

**Brian F. Leonard, Trustee, Plaintiff,**

v.

**First Commercial Mortgage Company, Defendant.**

**Bankruptcy No. BKY 96–30351.**

**Adversary No. 97–3130.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Dec. 24, 1998.

227

Gregory J. Wald, St Paul, MN, Owen H. Prague, Woodland Hills, CA, for Defendant.

Brian F. Leonard, Mpls., MN, for Plaintiff.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court on the parties' cross-motions for summary judgment. The Plaintiff appeared personally, on behalf of the Debtor's bankruptcy estate. The Defendant appeared by its attorney, Gregory J. Wald (Owen H. Prague, on the brief). Upon the moving and responsive documents and the arguments of counsel, the Court makes the following order.

## IDENTITY OF PARTIES AND NATURE OF ADVERSARY PROCEEDING

The Debtor was a company based in Minneapolis, Minnesota that manufactured circuit boards for computers. It filed for relief under Chapter 11 on January 23, 1996. The case was converted to one under Chapter 7 on March 11, 1997. The Plaintiff is the Trustee of the Debtor's bankruptcy estate.

The Defendant is a home mortgage lender based in Little Rock, Arkansas. Between late February and early May, 1995, the Defendant received payment of a total of $3,359.80, and applied it to the residential mortgage loan account of one of its borrowers. The funds to make these payments originated from the Debtor's corporate revenues, and were initially drawn off the Debtor's business checking account.

Alleging that the payment of the funds was a fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(2), the Plaintiff commenced this adversary proceeding. He seeks to avoid the transfer effected by the payments. The Plaintiff alleges that the Defendant was an "initial transferee" of the funds within the contemplation of 11 U.S.C. § 550(a)(1), and that therefore he may recover the transfer from the Defendant. To effectuate the avoidance, he seeks a money judgment against the Defendant.

The Defendant answered the Plaintiff's complaint. It denies most of the Plaintiff's fact allegations, raises several general equitable defenses, and specifically pleads that it was a good faith transferee within the scope of 11 U.S.C. § 550(b).

## MOTIONS AT BAR

The Plaintiff filed his motion for summary judgment first. He notes that the basic aspects of the transfers at issue are undisputed, and he brings forth evidence of the Debtor's financial condition at the time of the transfers. These points, he argues, make out his *prima facie* case for avoidance under the governing law. Then he argues that the Defendant must be characterized as the "initial transferee" of the transfers as a matter of law, and hence is liable to the estate under § 550(a)(1).

In its responsive motion, the Defendant points to various statements in deposition testimony and affidavits in the record, and notes that they are uncontroverted. These points, the Defendant argues, establish that it was no more than a mediate or immediate transferee that took the transfers unwittingly and without knowledge of their possible voidability. Thus, the Defendant argues, it is entitled to summary judgment on its affirmative defense.

## UNDISPUTED FACTS: THE TRANSFERS

The basic transactional facts, and some going to the affirmative defense, are uncontroverted. Other facts require some analysis

and discussion for their status to be ascertained. The former are as follows:

1. Before the Debtor's bankruptcy filing, one Christopher Casey was its managing agent. Michael Hullermann was an employee of the Debtor at the same time.

2. In early 1995, Casey and Hullermann entered a written contract, entitled "Lease Option and Purchase Agreement," under which Casey was to purchase Hullermann's house.

3. At the time, the Defendant held a mortgage against Hullermann's house, to secure a debt from Hullermann and another individual. The regular monthly payment obligation on this debt was $807.64, subject to a late payment penalty of $32.31.

4. On January 26, 1995, Hullermann filed for bankruptcy relief under Chapter 7 in this Court. Terri Melcher, Esq. was his counsel of record for the case.

5. Casey apparently took possession of Hullermann's house at some point in early 1995. Under the terms of the Lease Option and Purchase Agreement, he was then to make monthly mortgage payments to the Defendant as due, until he and Hullermann closed on the sale.

6. Casey failed to make payments to the Defendant for several months after Hullermann's bankruptcy filing.

7. Representing the Defendant, Owen Prague, Esq. wrote to Melcher to demand that Hullermann cure his default in payment, and to request that he reaffirm the debt secured by the mortgage.

8. By that point, Hullermann had moved to Wisconsin. To ensure that Casey followed through on his payment obligations pending the closing of the sale, Hullermann instructed Melcher to receive payment for the mortgage obligation from Casey, to deposit it in her law firm's trust account, and to forward payment to the Defendant via checks drawn on the trust account.

9. Between late February and early May, 1995, Casey caused to have four checks drawn on the Debtor's corporate business account, each in the amount of $839.95 and each payable to Melcher, and forwarded them to her.

10. Melcher deposited each such check in her firm's trust account. Via checks drawn on the trust account, Melcher paid a total of $3,359.80 to the Defendant on Hullermann's mortgage loan account.[1]

11. The Defendant negotiated all of the checks from Melcher's trust account; they were honored to the extent of $3,359.80.

12. In receiving the Debtor's checks from Casey, depositing them, and issuing checks to the Defendant, Melcher was acting as counsel to Hullermann and following the instructions of her client. Had he instructed her to direct payment elsewhere, she could and would have done so. She could not have acted contrary to his instructions without violating her legal and ethical duty to him.

13. Throughout this time, no employee or agent of the Defendant was aware of the existence of the Lease Option and Purchase Agreement or its terms, or of any agreement between Casey and Hullermann at all. Nor was any such person aware that the funds from which the four monthly payments were made had originally come out of the Debtor's business account.

## DISCUSSION

### I. Standards for Summary Judgment

Both parties have moved for summary judgment, the Plaintiff on his main claim and the Defendant on its affirmative defense. The governing rule is FED. R. BANKR. P. 7056.[2] To trigger the evaluation of the legal

---

1. Melcher's trust account checks were dated from one to eighteen days after the dates on the checks from the Debtor to her.

2. This rule makes FED. R. CIV. P. 56 applicable to adversary proceedings in bankruptcy. In pertinent part, FED. R. CIV. P. 56(c) provides that, upon a motion for summary judgment,

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [submitted in support of the motion], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

merits of claims and defenses under this rule, a movant must first demonstrate that there is "no genuine issue as to any ... fact" material to those claims or defenses. Then, even if the movant has so established the facts, it must show its entitlement to relief under the law. *Guinness Import Co. v. Mark VII Distributors, Inc.*, 153 F.3d 607, 610–611 (8th Cir.1998); *Osborn v. E.F. Hutton & Co.*, 853 F.2d 616, 618 (8th Cir.1988).

Counsel here did not stipulate to any of the facts, each side bringing forth its own battery of evidence and largely ignoring the other side's evidence. This lack of coordination did not make the evaluation of the record any too easy. Ultimately, though, the conclusion can be made: there is no triable fact issue as to either the Plaintiff's *prima facie* case for avoidance and imposition of liability on the Defendant, or as to the Defen-

dant's affirmative defense. This adversary proceeding, then, is amenable to summary judgment in its entirety.

## II. Substantive Law

### A. Introduction

As noted earlier, the Plaintiff invokes 11 U.S.C. § 548(a)(2) [3] as the source of his power to avoid the transfers of the Debtor's funds that ultimately reposed with the Defendant. The Plaintiff produced evidence to support findings that the Debtor received no value from the transfer of its funds to the Defendant [4], and that the Debtor was insolvent during the year before its bankruptcy filing.[5] The Defendant did not produce evidence to counter the Plaintiff's evidence on these elements. The Defendant's California counsel raised several evidentiary objections, but these were obscure or nonmeritorious.[6]

3. In pertinent part, this statute provides:
 (a) The trustee may avoid any transfer of an interest of the debtor in property, ... that was made ... on or within one year before the date of the filing of the [bankruptcy] petition, if the debtor voluntarily or involuntarily-
 ...
 (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
 (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation...

4. The Debtor was not a party to any contract with the Defendant. The Debtor received nothing in money, goods, services, or other value in exchange for the payments made to Hullermann's mortgage loan account.

5. As evidenced by its corporate federal income tax returns for 1994 and 1995, the Debtor's debts exceeded the value of its assets by some $78,000.00 in 1994, and some $139,000.00 in 1995. Such an excess of liabilities over assets meets the "balance sheet" definition of "insolvent" applicable to a corporation under the relevant provisions of 11 U.S.C. § 101(32)(A):
 ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation ...
 See *In re Bellanca Aircraft Corp.*, 56 B.R. 339, 385 (Bankr.D.Minn.1985) (quoting *American Nat'l Bank & Trust of Chicago v. Bone*, 333 F.2d 984, 989 (8th Cir.1964)). The adjudication on this issue is almost purely factual in nature. *In re Muncrief*, 900 F.2d 1220, 1224–1225 (8th Cir. 1990). In addition, the Debtor posted actual

operating losses of $190.00 in 1994 and $39,299.00 in 1995–further underlining the picture of a company that was piling up substantial debt to trade suppliers that remained unpaid when it went into Chapter 11.

6. The only comment on opposing evidence lies in a set of three "Evidentiary Objections to Matters Contained in Trustee's Motion for Summary Judgment," filed by the Defendant's California counsel. Two of the three "objections" go to documents from the Debtor's books and records that were attached as exhibits to the Plaintiff's verified motion, and specifically referenced in the text of the motion. The verbiage that the Plaintiff used to farm in these documents was far from precise, and it was not structured from the perspective of a trial advocate as Rule 56 clearly contemplates. Nonetheless, it and the surrounding circumstances of the litigation are just barely enough to establish the "business records" exception of FED. R. EVID 803(b). This overcomes the Defendant's hearsay objection. The other "objection" is to the use of an affidavit from Melcher, prepared not long after her deposition was taken at the Defendant's instance. The gist of the objection is that the Plaintiff's counsel should have developed the subject matter of the affidavit at the deposition, did not, and now "unfairly" and "prejudicial[ly] ... confuses the issues which were otherwise made available for proper discovery" at the deposition. Ultimately, the complaint here is one of ambush, and it is framed only in a broad and non-technical sense. The unspoken premise seems to be that an attorney must open out the testimony of his own witness into the substance of his own client's case-in-chief, when that witness is being deposed at the instance of his opponent and primarily on the elements of the opponent's affirmative de-

■ In sum, it is clear that Casey was using the Debtor's corporate checking account as if it were his own property, or at least as if it were a free-flowing source of credit, gift, or undocumented compensation to him. However, he was not authorized by the Debtor to directly extract its revenues for payment on his personal obligations. When a trustee establishes that a pre-petition transfer of a debtor's property was made on account of a third party's debt or obligation, the burden shifts to the defendant-recipient to demonstrate that the debtor still received some other benefit out of the transaction. That other benefit must have been tangible, of concrete economic value, and reasonably equivalent to what the debtor gave up. *In re Bargfrede,* 117 F.3d 1078,1080 (8th Cir.1997); *In re Minnesota Utility Contracting, Inc.,* 110 B.R. 414, 419–420 (D.Minn. 1990); *In re Jolly's, Inc.,* 188 B.R. 832, 842 (Bankr.D.Minn.1995); *In re Young,* 148 B.R. 886, 893–894 (Bankr.D.Minn.1992), *aff'd,* 152 B.R. 939, 949 (D.Minn.1993), *rev'd on other grounds,* 82 F.3d 1407 (8th Cir.1996), *vacated sub nom. Christians v. Crystal Evangelical Free Church,* — U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997), *on remand,* 141 F.3d 854 (8th Cir.1998), *cert. denied sub nom. Christians v. Crystal Evangelical Free Church,* — U.S. ——, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998).

The Defendant has not carried this burden; it has not produced any evidence going to the point at all. The Plaintiff thus has established that, as a matter of uncontroverted fact, and pursuant to the governing law, the transfer of funds out of the Debtor's checking account was a fraudulent transfer avoidable under § 548(a)(2).

The real issue posed by these motions goes not to the Plaintiff's ability to avoid the transfer, but to the identity of the entity from which he may recover in consequence of the avoidance.[7] After a trustee avoids a transfer and 11 U.S.C. § 551 has automatically snared the subject asset or value[8], 11 U.S.C. § 550 names the party or parties that are liable to the estate.

■ 11 U.S.C. §§ 550(a)-(b)[9] are the provisions relevant to the situation at bar: where funds extracted from a debtor can be traced intact through a series of transfers close in time, and linked by agreement. As a general proposition, § 550(a) allows recovery from all participants in the chain of transfers. *In re Sherman,* 67 F.3d 1348, 1356 (8th Cir.1995). Section 550(b), however, sets a dividing line of vulnerability at a point along that chain. Simply stated,

[U]nder § 550(b), a mediate or immediate transferee receives protection if it has tak-

---

fense. The Defendant's counsel does not cite any authority for this proposition, and there probably is a good reason for that: an attorney's duty of zealous advocacy may well prohibit such action, where it would or could flag other areas of defense for the opponent. Ultimately, in the adversarial context of discovery, it was the Defendant's burden to foresee the particulars brought out in Melcher's affidavit, and to inquire of them at deposition, if it intended to attack the Plaintiff's case-in-chief and his response to the affirmative defense. The Defendant did not recognize that burden, or at least did not assume it. As much and as loudly as he posits "unfair prejudice," the Defendant's California counsel does not identify the prejudice. Whatever the prejudice might be, it is not "unfair" under the circumstances.

7. The framers of the Bankruptcy Code recognized that these were two different issues. H.R. REP. No. 595, 95th Cong. 1st Sess. 375 (1977); S. REP. No. 989, 95th Cong., 2d Sess. 90 (1978). *See also Lippi v. City Bank,* 955 F.2d 599, 605 (9th Cir.1992); *In re Harbour,* 845 F.2d 1254, 1255 (4th Cir.1988).

8. In pertinent part, this statute provides:

Any transfer avoided under [11 U.S.C. § ] 548 ... is preserved for the benefit of the estate but only with respect to property of the estate.

9. In pertinent part, these statutes provide:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under [11 U.S.C. § ] 548 ..., the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

(b) The trustee may not recover under [11 U.S.C. § 550](a)(2) ... from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

en for value in good faith without knowledge of the voidability of the transfer. However, an initial transferee receives no such protection.

*In re Baker & Getty Financial Services, Inc.*, 974 F.2d 712, 721 (6th Cir.1992). *See also In re Sherman*, 67 F.3d at 1356. Thus, the initial transferee of an avoided transfer is strictly liable to the estate, whether it colluded with the debtor or was an innocent and unwitting recipient. *In re Bullion Reserve of North Am.*, 922 F.2d 544, 547 (9th Cir. 1991); *Bonded Fin'l Serv., Inc. v. European American Bank*, 838 F.2d 890, 895 (7th Cir. 1988); *In re Moskowitz*, 85 B.R. 8,10 (E.D.N.Y.1988); *In re Dominion Corp.*, 199 B.R. 410, 413 (9th Cir. BAP 1996). A subsequent transferee, mediate or immediate, may avoid liability upon a showing of status analogous to that of a bona fide purchaser. *In re Coutee*, 984 F.2d 138, 140 n. 2 (5th Cir.1993); *In re C–L Cartage Co., Inc.*, 899 F.2d 1490, 1495 (6th Cir.1990); *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1201 (11th Cir.1988); *In re Presidential Corp.*, 180 B.R. 233, 236 (9th Cir. BAP 1995); *Cf. Bonded Fin'l Serv.*, 838 F.2d at 896 n. 3 ("... subsequent transferees who lack 'good faith' must stand and deliver ...").

The Defendant invokes this dichotomy in its defense. Its argument unfortunately is tinged with a shrill *ad hominem* attack on the Plaintiff and his motives.[10] At base, though, the Defendant raises a valid issue: because the Defendant's proffered evidence going to § 550(b)(1) is unrebutted, who indeed was the "initial transferee" here? As the Defendant would have it, the Plaintiff failed to join several other necessary parties-defendant, and the liable party is anyone but itself.

### B. The Statute, As Applied.

### 1. Melcher as the Initial Transferee

■ The Defendant's first salvo is to set Melcher up as the initial transferee. It relies on the fact that she was the named payee on checks drawn right out of the Debtor's business account; that she deposited those checks in an account over which she had withdrawal privileges; and that she then drew them out for application on her client's debt. For authority, the Defendant cites the extensive line of cases that define the status of a transferee under § 550(a) by the possession and exercise of "dominion and control" over the transferred asset. This rule had its roots in caselaw under the Bankruptcy Act of 1898, but its first and still fullest exposition under the Bankruptcy Code is found in *Bonded Fin'l Serv.*, 838 F.2d at 893–895. The Defendant correctly notes that the Eighth Circuit has adopted the "dominion and control test" as a general proposition, in *In re Reeves*, 65 F.3d 670, 676 (8th Cir.1995).

■ However, the caselaw contains further refinements that undercut this rather blunt attack. It is not the simple possession of funds, coupled with a one-time act of directing them on to a further transferee, that makes out the "dominion and control" of *Bonded Financial Services*. Rather, it is an unfettered *legal* right to use the funds for the possessor's *own* purposes and benefit. *In re Coutee*, 984 F.2d at 140 n. 4; *In re Baker & Getty Fin'l Serv.*, 974 F.2d at 722; *In re Blinder, Robinson & Co., Inc.*, 162 B.R. 555, 562 (D.Colo.1994); *In re Colombian Coffee Co., Inc.*, 75 B.R. 177, 179 (S.D.Fla.1987).[11] Thus, an entity that is in possession of transferred funds as a "mere conduit" between

10. The accusation is that the Plaintiff deliberately refused to pursue the other participants in the transactions, in favor of going after the "big pocket." This protest goes neither to law-particularly given the import of the statute discussed *infra* at pp. 235–236 nor to the relevant facts.

11. The requirement that the possessor have a discretionary legal right to dispose of the funds was articulated at least as early as 1930, under the Bankruptcy Act's analogue to § 550, by Justice Benjamin Cardozo. *See Carson v. Federal Reserve Bank*, 254 N.Y. 218, 172 N.E. 475, 482 (1930) ("Directly or indirectly [the person to be

held liable] must have had a beneficial interest in the ... thing to be reclaimed" via a trustee's avoidance powers). Under the Bankruptcy Code, the point was most pointedly expressed in the Seventh Circuit's oft-quoted and somewhat overdrawn analogy: where a recipient of funds is "free to invest the whole ... in lottery tickets or uranium stocks," it is a "transferee" under § 550(a). *Bonded Fin'l Serv.*, 838 F.2d at 893. *Cf. In re Presidential Corp.*, 180 B.R. 233, 238 (9th Cir. BAP 1995) ("The ability to change one's mind regarding the disposition of property is evidence of dominion or control.").

other parties in a transactional chain is not a "transferee" within the scope of § 550(a). *E.g., In re Coutee,* 984 F.2d at 140 n. 4; *Lippi v. City Bank,* 955 F.2d 599, 611 (9th Cir.1992); *In re Columbia Data Products,* 892 F.2d 26, 28 (4th Cir.1989); *In re Chase & Sanborn Corp.,* 848 F.2d at 1200; *In re Dominion Corp.,* 199 B.R. at 413–414.

 Generally, "mere conduits" hold transferred funds via escrow, trust, or deposit, and do so only in the status of commercial or professional intermediaries for the parties that actually hold or receive a legal right, title, or interest. Examples of them include banks, *In re First Security Mtg. Co.,* 33 F.3d 42, 44 (10th Cir.1994) and *In re Colombian Coffee Co., Inc.,* 75 B.R. at 178; real estate escrow and title companies, *In re Moskowitz,* 85 B.R. 8, 10–11 (E.D.N.Y.1988) and *In re Williams,* 104 B.R. 296, 298–299 (Bankr. S.D.Cal.1989); securities or investment brokers, *In re Blinder, Robinson & Co.,* 162 B.R. at 562 and *In re Dominion Corp.,* 199 B.R. at 414–415; and attorneys holding funds in trust in connection with settlements of disputes, *In re Coutee,* 984 F.2d at 141 and *In re Fabric Buys of Jericho,* 33 B.R. 334, 337 (Bankr.S.D.N.Y.1983). While not always articulated as such, the "mere conduit" exception is supported by basic fairness as well as public policy considerations: regardless of the lack of qualifying language in § 550(a), the broadest application of the concept of "transferee" under it would inappropriately subject mere stakeholders, bailees, and intermediaries to liability, where they had never stood to gain personally from the funds mo-

mentarily in their possession. *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 130 F.3d 52, 56 (2d Cir.1997); *In re Granada, Inc.,* 156 B.R. 303, 306 (D.Ut.1990); *In re Moskowitz,* 85 B.R. at 11.[12]

 The uncontroverted evidence shows that, when Melcher received and then disbursed the funds from the Debtor, she was no more than the "mere conduit" envisioned by these cases: she was acting solely as an intermediary, without a legal interest in the funds and certainly without authority to direct them to her own uses.[13] Holding the funds "only for the purpose of fulfilling an instruction to make [them] available to someone else," *Bonded Fin'l Serv.,* 838 F.2d at 893, Melcher was never a "transferee" within the meaning of § 550(a). Hence, she could not have been "the initial transferee" of the funds.

### 2. Casey as the Initial Transferee.

 The Defendant has never overtly articulated a characterization for Casey in the terms of § 550(a), but its second line of attack is to suggest that he should be deemed the party strictly liable to the Plaintiff. There is something to be said for tagging Casey as an "entity for whose benefit [the] transfer was made," both in a general sense and under the statute's text. However, that does not lift strict liability from any party in the chain of actual possession or title. By its simple, disjunctive wording, § 550(a)(1) merely sets up the beneficiary who never had title or possession as an *alternate* defendant.

---

**12.** Judicial restraint is promoted when the fixing of liability is made via the definition of "transferee," and is structured by the criterion of dominion/control/possession-of-interest. Courts that addressed this issue early in the Code's history construed "transferee" as any entity that received the subject asset in any way, no matter how fleeting, and then invoked "flexibility" and "equitable powers" to relieve some transferees from liability where the imposition somehow did not seem fair. *E.g., In re Harbour,* 845 F.2d at 1256–1257; *In re Fabric Buys of Jericho, Inc.,* 33 B.R. at 337. The *Finley, Kumble* court properly criticized this approach for its lack of predictability:

> Under this construction, every courier, every bank and every escrow agent may be subjected to great and unimagined liability that is mitigated only by powers of equity. This comes

close to making equity a principle of *statutory* construction.

130 F.3d at 56. *See also Bonded Fin'l Serv.,* 838 F.2d at 895.

**13.** Of course, Melcher *could* have exercised her signatory authority over her client trust account to make personal use of the funds, but it would be absurd to vest her with "transferee" status from that unadorned circumstance. Had she exercised that "raw power," *In re Baker & Getty Fin'l Serv., Inc.,* 974 F.2d at 722, it would have been a conversion of her client's property, in violation of her legal and ethical duties. It would not have given her any enforceable right, title, or interest in the funds. *In re Coutee,* 984 F.2d at 141 n. 4.

There is a bit of caselaw authority for affixing "initial transferee" status to the principal of a corporate debtor who has diverted the company's assets to a direct payment of the principal's own debts, or the debts of other entities that the principal controls. *In re Richmond Produce Co., Inc.*, 195 B.R. 455 (N.D.Cal.1996); *In re Auto–Pak, Inc.*, 73 B.R. 52 (D.D.C.1987); *In re Concord Senior Housing Fdn.*, 94 B.R. 180 (Bankr.C.D.Cal. 1988). *Cf. In re Food & Fibre Protection, Ltd.*, 168 B.R. 408 (Bkrtcy.D.Ariz.1994); *In re Jorges Carpet Mills, Inc.*, 50 B.R. 84 (Bankr.E.D.Tenn.1985). These decisions seem to find their rationale in a reversed application of the "dominion and control" theory: in making such a payment, the converting principal uses or misuses his office's control over the corporation's assets; he takes personal benefit from that use or misuse; and hence he must have been a "transferee" of something, before all other parties in the chain of actual receipt. *In re Richmond Produce Co., Inc.*, 195 B.R. at 462 (emphasizing principal's "complete dominion and control over" debtor-corporation of which he was sole shareholder, in terming him "initial transferee" of funds paid from debtor's account to bank at which debtor maintained business accounts, for issuance of cashier's check that was then tendered to creditor of principal); *In re Auto–Pak, Inc.*, 73 B.R. at 54 (debtor's principal "essentially took control of the funds" when he took debtors' check made payable to affiliated company's creditor to bank, traded it for cashier's check made payable to creditor, and then tendered that to creditor; this made him, or affiliated

company, an immediate transferee); *In re Concord Senior Housing Fdn.*, 94 B.R. at 183 (managing agent of debtor "exercised sufficient control over ..." [certificate of deposit funded with debtor's revenues but held on account of his management company] to make him a transferee, when he pledged certificate of deposit to secure his personal debts).

■ The problems with this line of cases, however, are several. The decisions never really address the conundrum of how a party outside the formal chain of title and possession can be deemed the recipient of a "transfer," given the requirement of 11 U.S.C. § 101(54)[14] that "property or ... an interest in property" pass to the transferee.[15] They also ignore the several well-reasoned decisions holding that the concepts of "entity for whose benefit" and "transferee" are mutually exclusive, principally *Bonded Fin'l Serv.*, 838 F.2d at 895–896. *See also In re Chase & Sanborn Corp.*, 904 F.2d at 597 n. 22; *Lippi v. City Bank*, 955 F.2d at 611; *In re Columbia Data Products, Inc.*, 892 F.2d at 29; *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655, 666 n. 16 (N.D.Ill.1991); *In re Newman Cos., Inc.*, 140 B.R. 495, 498 (Bankr.E.D.Wis.1992). Given that mutual exclusivity, it is difficult to conceive how a participating entity outside the chain could be anything under the statutory scheme other than an "entity for whose benefit."

For the reasons just cited, and for their failure to articulate a rationale on the plain language of the statute, these decisions are not good authority.[16] Whether he was an

---

**14.** In pertinent part, this provision defines "transfer" as:

> ... every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property ...

**15.** By contrast, the rationale of *In re Food & Fibre Protection, Inc.*, and *In re Jorges Carpet Mills, Inc.* makes some sense, if one looks at the nominal title given the payee of a cashier's check. In both cases, the corporate debtor transferred funds to the name of its president and sole shareholder, who used them to purchase a cashier's check to pay his individual debt. (In *In re Food & Fibre Protection, Inc.*, the transfer between debtor and principal was ac-

complished via a first cashier's check payable to the principal. The decision in *In re Jorges Carpet Mills, Inc.* does not reveal the mode of the first transfer.) Focusing on the power over the funds that the principal had after he received the cashier's check from debtor, the courts in both decisions concluded that the principal was the initial transferee. 168 B.R. at 422. If for no other reason, these holdings are defensible because the individual principal was a real party in the chain of title and possession.

**16.** The rationale of the decisions has been properly questioned. *In re Presidential Corp.*, 180 B.R. at 239 n. 5. As applied in the earlier cases, it was criticized at compelling length and rejected in *In re M. Blackburn Mitchell, Inc.*, 164 B.R. 117, 127–130 (Bankr.N.D.Cal.1994).

"entity for whose benefit" or not, Casey was never a recipient or repository of the funds. Thus, he was never a transferee, and certainly was not an initial one.

### 3. The Defendant as the Initial Transferee.

■ Applying the "mere conduit" exception takes the holder of that status out of the chain. *Bonded Fin'l Serv.*, 838 F.2d at 893 (the conduit-intermediary "may be disregarded" for § 550(a) analysis); *In re Moskowitz*, 85 B.R. at 11. Excising Melcher leads ineluctably to vesting the Defendant with the status of initial transferee; by the simple sequence of the remaining chain, it is deemed to have taken the transfer from the Debtor.[17] This means that it is liable to the estate. *In re C–L Cartage Co., Inc.*, 899 F.2d at 1495.[18]

### 4. The Defendant's Arguments Under Equity and Rule 19.

■ Among its several pleaded affirmative defenses, the Defendant maintained that the Plaintiff had failed to join Melcher, Hullermann, and Casey as indispensable parties. The Defendant's California counsel raised this point in his brief only in passing, and more as a part of his personalized attack on the Plaintiff's strategy. Nonetheless, it is appropriate to address it here-if for no reason other than to soften the result that the statute dictates in an uncompromising fashion.

Melcher's status under this argument has been addressed already, and entirely against the Defendant; since she could not even be found liable, she scarcely should have been named as a party. The argument is somewhat better as to Hullermann, and particularly as to Casey; the former, after all, received the indirect benefits of escaping default and building a minor amount of equity, and the latter lifted funds from the Debtor's coffers to meet his personal obligation without authorization. The Defendant complains of being put into the Plaintiff's cross-hairs for its unwitting receipt, while neither of these ostensible beneficiaries were named or pursued. It makes this plaint to bolster a two-pronged attack: a generalized plea for relief from substantive liability, and (apparently) a late-made pitch under FED R. CIV. P. 19(a).[19]

---

**17.** This conclusion cuts off the Defendant's § 550(b) defense. Had it not been skewered by "initial transferee" status, it would have had that haven without question. There was nothing in the form of the payments it received through Melcher that would have led a reasonable person to suspect a fraudulent transfer of the Debtor's property. *In re Sherman*, 67 F.3d at 1357. Further, the Plaintiff failed to carry his respondent's burden of production on the affirmative defense; the Defendant's evidence established that it received the payments in utter good faith, believing it was receiving nothing more than an ordinary-course cure and performance from its own borrower's funds. The result at bar is none too savory, given the fact that the Defendant was utterly unaware that the funds had been extracted from the Debtor; unfortunately, though, the result is mandated by the statute and its judicial construction.

**18.** The analogy here is to the six payments made directly from the debtor in *C–L Cartage* to the bank there, not to the three payments funneled first through the bank account of the debtor's principal's mother.

**19.** This rule is incorporated by FED. R. BANKR. P. 7019. In pertinent part, it provides:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties ... or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

The Defendant's California counsel does not cite this rule for the motions at bar, but the drift of his alternate argument is that the Plaintiff should now be denied relief because he failed to join the other potential defendants. Dismissal is available under FED R. CIV. P. 19(b), where an "indispensable" party described in FED R. CIV. P. 19(a)(1)-(2) *"cannot* be made a party" (emphasis added), and "equity and good conscience" dictate that the action should not proceed. The Defendant originally raised Rule 19 in its answer, as one of its affirmative defenses, but it never made a motion for joinder of additional parties-defendant. Really, this issue is too late in coming; the question of whether complete relief could be properly accorded and allocated without the other participants in tow was one to be posed far in advance of the merits now presented. One can, however, defer to the Defendant

The Defendant is not undeserving of sympathy; it stands alone here, strictly liable, while the party or parties who gained in-hand benefit from the avoided transfers were not subjected to the same onus. Unfortunately for the Defendant, however, it has no relief from the application of § 550(a) at the Plaintiff's behest, under either of its theories. The earlier courts that construed § 550 slathered "equity" into the theory of their construction, and proposed an escape from liability by giving the benefit of generalized considerations of "fairness" to parties deemed relatively innocent in a chain of transfers. *In re Harbour*, 845 F.2d at 1258; *In re Colombian Coffee Co.*, 75 B.R. at 179–180; *In re Fabric Buys of Jericho, Inc.*, 33 B.R. at 337. The developing rule, however, properly rejects this approach-on the ground that assuming equitable power to override a clear statutory imposition of liability could leave judicially-carved exceptions swallowing the legislative branch's rule. *In re Finley, Kumble*, 130 F.3d at 56; *Bonded Fin'l Serv.*, 838 F.2d at 894–895. These courts impose strict liability on first-tier recipients for different articulated reasons: the allocation of power in the original transaction, *Bonded Fin'l Serv.*, 838 F.2d at 891–892, more generalized economic considerations, *id.*, and judicial restraint and the policy in favor of containing pettifoggery and preventing nuisance lawsuits, *In re Finley, Kumble*, 130 F.3d at 56.

The decisions that apply the statutory dictate of liability as written are simpler, more principled, and more predictable; their opponents simply do not articulate a rule that meets these values over a broader variety of possible fact patterns. Hence, the Defendant's protest that "it just isn't fair" to saddle it with judgment does not avail.

■ Neither can its claim that the Plaintiff should have sued Hullermann or Casey instead, or at least joined them as additional parties-defendant before it should be found liable. Admittedly, § 550(a)(1) is phrased in the disjunctive. This suggests that a trustee must elect between naming the initial trans-feree and naming the beneficiary as defendant, at least in the case of an insider's expropriation like the one here. The problem, however, is that the statute does not dictate or prioritize the trustee's choices. To opposite effect, the dictate of single satisfaction under § 550(d) [20] can be read globally: by a negative but unmistakable inference, it contemplates a joint suit against both initial transferee and converting beneficiary, as well as all subsequent transferees not entitled to the defense of § 550(b). *In re M. Blackburn Mitchell Inc.*, 164 B.R. at 130 ("Under § 550(a)(1), *both* entities are liable"- referring to "entity for whose benefit" *and* "transferee"). Again, though, no language in the statute dictates joinder. By neither prioritizing the estate's recourse nor mandating joinder, then, the statute allows the trustee to pick his named defendants. *Id.* at 130 n. 19. At least on its face, it does not affect the potential claims, cross- or future, for indemnification or something else, that the named defendant may bring against the unnamed participants. *Id.* at 131 and n. 21.

■ As a broader matter, the permissive nature of the identification of liable parties in §§ 550(a)(1)-(2) functions much like the prefatory language of § 550 that gives the trustee the choice of *in rem* or monetary relief: to promote making the estate whole by all appropriate means, and to allow the trustee discretion in structuring the litigation to do so. *In re Willaert*, 944 F.2d 463, 464 (8th Cir.1991). If joining Hullermann or Casey as co-defendants was appropriate under § 550(a)(1), doing so would have allowed the Defendant to assert a cross-claim for indemnity against them. However, it would not have prevented an adjudication of joint and several liability against all of the defendants. This would have left the Defendant as the largest and most vulnerable pocket for satisfaction of the judgment. That, in turn, would have relegated it to asserting its right to indemnity against its co-defendants, and then enforcing it. Essentially, that equates to the position the Defendant now holds; it just will

despite its delay, and reach the issue of non-joinder-because, as held *infra*, the governing law defeats its argument on indispensability anyway.

20. Under this statute, "[t]he trustee is entitled to only a single satisfaction under" § 550(a).

have to sue out its claim for indemnification in another forum. Ultimately, though, the non-joinder of potential co-defendants, does not relieve this defendant of the liability that the statute unavoidably imposes on it.

### 5. The Result.

As an initial transferee, the Defendant is strictly liable to the bankruptcy estate for the avoided transfer. The uncontroverted facts establish it as an unwitting recipient of mortgage payments that justifiably believed it was receiving in the ordinary course, but the law makes that circumstance irrelevant to the Plaintiff's right of recovery against it.

### ORDER FOR JUDGMENT

Upon the memorandum of decision just made,

IT IS ORDERED, ADJUDGED AND DECREED:

1. The Plaintiff's motion for summary judgment is granted.

2. The Defendant's motion for summary judgment is denied.

3. The transfer of funds from the Debtor's business checking account between late February and early May, 1995, to the Defendant, in the total of $3,359.80, was a fraudulent transfer within the meaning of 11 U.S.C. § 548(a)(2), and is hereby avoided.

4. Pursuant to 11 U.S.C. § 551, the transfer so avoided is preserved for the benefit of the Debtor's bankruptcy estate.

5. Pursuant to 11 U.S.C. § 550(a)(1), the Plaintiff shall recover from the Defendant the sum of $3,359.80, together with such costs and disbursements as he may tax hereafter pursuant to applicable statute and rule.

LET JUDGMENT BE ENTERED IN ACCORDANCE WITH TERMS 3 THROUGH 5.